IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

WADE B. SATTERFIELD          Case No.: 2:16-cv-00665-MSD-LRLVA-ED

               Plaintiff,

   vs.

CITY OF CHESAPEAKE, VIRGINIA

CHARLES HORNE, individually
and in his capacity as Captain
for the Chesapeake Police Department

JACK BIDER, individually
and in his capacity as sergeant
for the Chesapeake Police Department

KEVIN HAMMOND, individually
and in his capacity as Lieutenant.
for the Chesapeake Police Department

COLONEL K.L. WRIGHT, individually
and in his capacity as chief of police
for the Chesapeake Police Department

                       Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff, WADE B. SATTERFIELD, by and through his undersigned counsel, Carteia V.

Basnight, Esquire, and hereby complains against the Defendants, CITY OF CHESAPEAKE

POLICE DEPARTMENT, CAPTAIN CHARLES HORNE, SARGENT JACK BIDER,

LIEUTENANT KEVIN HAMMOND and COLONEL K.L. WRIGHT, CHIEF OF POLICE, and for

his complaint states as follows:

## BRIEF STATEMENT OF CLAIM

1.      Beginning on or about March 6, 2015, Defendant, its agents and employees initiated an investigation into alleged misconduct by Plaintiff in regards to undercover detective tactics Plaintiff used on or about March 3-5, 2015.  The investigation was the direct consequence of allegations raised by Plaintiff's co-worker Detective Joe Justice (hereinafter "Det. Justice") Det. Justice, a white male employee, who reported, under questionable circumstances, that Plaintiff had violated Department Policy by using "inappropriate language" via text message with a minor. Det. Justice also reported that Plaintiff had committed an act of entrapment. During the investigation, Defendants investigated and charged Plaintiff with acts that other Caucasian Officers had committed but were not charged or reprimanded for. These acts are described in detail below.  During the investigation, Defendant initiated protocol and procedure in a manner different that used when investigating Caucasian co-workers.  The specifics of Plaintiff's assertions are outlined below. As a direct result of Defendant investigating Plaintiff in a discriminatory manner, Plaintiff received reprimands, was denied to participate in trainings, was removed from his assignment as detective in the Criminal Investigation Unit and placed back "on the street" in operations.

2.      Although Plaintiff never received a formal notice of charges, at some point, Plaintiff was charged with failure to properly collect evidence, failure to properly keep and document case management, and failure to obtain prior authorization before changing work schedule. Each of the above are discussed in detail below. Although several of the charges were found to be unsubstantiated, Plaintiff was charged and investigated for acts that his similarly-situated Caucasian co-workers had committed, but were not charged, investigated, or reprimanded. For the substantiated charges against Plaintiff, his punishment was not proportionate to the charges," nor equivalent to punishments or reprimands administered to his Caucasian co-workers, who committed similar or egregious acts of alleged misconduct.

## NATURE OF ACTION

3.      This is an action for damages and equitable relief, based on discrimination, retaliation

and hostile work environment in the workplace undertaken by Defendant, its agents and or

employees against plaintiff based on his race.   All the acts complained of occurred exclusively

within Virginia.  This is an action to vindicate violations of the Plaintiff's civil rights and to redress

the unlawful and discriminatory conduct and employment practices of the Defendants. This action

arises out of wrongful/unwarranted reprimands and removal from his employment assignment as a

detective in the Criminal Investigation Unit of the Chesapeake Police Department based, in whole or

in part, upon his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

Section(s) 2000e et seq., and the Civil Rights Act of 1866, as amended by the Civil Rights

Restoration Act of 1991, 42 U.S.C. Section 1981.

## JURISDICTION AND VENUE

4.      This is an action authorized and instituted pursuant to: Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq.; the Civil Rights Act of 1866, as

amended by the Civil Rights Restoration Act of 1991, 42 U.S.C. Section 1981; 42 U.S.C. Section

1981A; 42 U.S.C.  The jurisdiction of this Court is predicated upon 28 U.S.C. Section 1331 and

1343, to redress the unlawful deprivation of Plaintiff's rights secured, guaranteed and protected by

federal law. The Court also has jurisdiction pursuant to 28 U.S.C. Sections 2201 and 2202 relating to

declaratory judgments.

5.      Venue is proper in the United States District Court for the Eastern District of Virginia

pursuant to 28 U.S.C. Section 1391(b), wherein all Defendants regularly conduct business and where

all the wrongful conduct occurred, and is where Plaintiff was employed when all acts herein

occurred.

## PARTIES

6.      Plaintiff Wade B. Satterfield is a resident of North Carolina and has been an employee of Defendant since January of 2001.

7.      Plaintiff has made great contributions to the Chesapeake Police Department and has maintained an outstanding record or performance and reputation. Since the start of his employment, Plaintiff has performed his duties in a professional and outstanding manner. (**See Exhibit A Plaintiff's** *Evaluations)*

8.      Defendant City of Chesapeake, Virginia in its Police Department is an employee within the definition of title VII to the 1964 Civil Right Act. It is also political subdivision of the Commonwealth of Virginia, pursuant to Title 15.2 of the Virginia Code, and a "person" subject to suit within the meaning of 42 U. S.C Section 1983. The city of Chesapeake employs more than 500 employees and has done so at all times relevant to this action.

9.      Defendant, Captain Charles Horne (hereinafter Capt. Horne) was an employee of Chesapeake Police Department and was within Plaintiff's chain of command at all times relevant to the complaint herein.

10.      Defendant, Sargent Jack Bider, (hereinafter "Sgt. Bider") was an employee of the City of Chesapeake, Virginia Police Department and was within Plaintiff's chain of command at all times relevant to the complaint herein.

11.      Defendant, Lieutenant Kevin Hammond, (hereinafter "Lt. Hammond") was in a supervisory position in the command structure for the city of Chesapeake Virgini Police Department at all relevant times in his complaint

12.      Defendant, Colonel K.L. Wright, (hereinafter "Chief Wright"), is and has been the Chief of Police for the city of Chesapeake, Virginia.

13.     Plaintiff sues each defendant (except the city) in both their individual and official capacities. No answer has been filed in response to Plaintiff's original complaint, however several motions to dismiss have been filed. This amended complaint is being filed within 21 days of Defendants' responsive pleadings.

14.     The actions of defendants Horne, Bider, Hammond, and Wright individually and/or in conjunction with other defendants and/or others, were taken under color of state statutes, customs, ordinance, and usage of the City of Chesapeake Virginia, a political subdivision of the Commonwealth of Virginia, and the Chesapeake Police Department, rendering those individuals liable for their individual and/or collective actions, and the city liable, under constitutional law principles.

## ADMINISTRATIVE PRE-REQUSITES

15.     On April 13, 2015, Plaintiff orally expressed his concerns of discrimination to upper management

16.     On April 29, 2015 Plaintiff reported his same discrimination concerns to upper management in writing. **(See Exhibit B)**

17.     On November 4, 2015 Plaintiff received a letter informing him that his concerns were investigated and found to be unsubstantiated. **(See Exhibit C)**

18.     On July 17, 2015 Plaintiff filed a formal complaint with the United States Equal Employment Opportunity Commission **(See Exhibit D)**

19.     On August 22, 2016 Plaintiff received his right to sue notice **(See Exhibit E)**

20.     As such, Plaintiff has exhausted all his administrative remedies as required by law.

21.     This Complaint was filed within 90 days of Plaintiff's receipt of the above stated notice.

## STATEMENT OF FACTS

22.     On or about March 2, 2015 Plaintiff was assigned an investigation involving death and bodily injury threats to three residents of Chesapeake vis text messages from an unidentified person.  Each reporting individual believed that the threats were real and coming from a terrorist group. The threats induced fear in the victims and raised great concern for safety. **(See Exhibit F1, F2, F3).** The unidentified person also stated that he would kill any law enforcement officer that responded if called by the victims. One victim reported that he purchased a gun as he believed that someone was going kill or severely harm him.

23.     On or about March 3, 2015 Plaintiff requested a court order from legal secretary Robin Harrell (hereinafter "Harrell") to obtain phone records for the suspects phone carrier, T-Mobile.

24.     At the time of request, Plaintiff was informed that Harrell was out sick and could not fulfill the request until the following week. Plaintiff was also informed that on average, T-Mobile takes a minimum of three months to provide phone records.

25.     On or about March 3, 2015 Plaintiff directly informed his supervisor, Sergeant Bider that he, plaintiff would be texting the unidentified person in an effort to locate and identify the individual.

26.     On March 3, 2015 as an undercover detective, Plaintiff began to text the unidentified suspect in a manner identifiable and on the same level as the unidentified suspect. Suspect responded to Plaintiff throughout the day as well as throughout the evening. **(See Exhibit G)**

27.     On March 3, 2015 and March 4, 2015, Plaintiff personally appeared before Sgt. Bider and read Sgt. Bider the exchange of text messages between himself (Plaintiff) and the unidentified suspect. Bider responded to the exchange in a joking manner; stating to Plaintiff "that

[shit] is funny; this is hilarious". Sgt. Bider approved of Plaintiff's tactics to "flush" the suspect out by using vocabulary similar to the unidentified suspect and in a manner to anger the suspect so that suspect would either (1) become bold enough to identify himself; or (2) become angry enough to agree to meet Plaintiff.

28.     Neither on March 3, 2015, nor on March 4, 2105 was Plaintiff reprimanded or advised not to use the language he expressed in the text messages.

29.     On or about March 4, 2015 Plaintiff received a call from an officer in the Hampton Police Department, stating that the officers were investigating a complaint involving harassing phone calls from Plaintiff's number.

30.     At that time, Plaintiff identified himself as Detective Wade Satterfield from the Chesapeake Police Department. Plaintiff, then expressed to Hampton Police that he (Plaintiff) was undercover investigating threating calls.

31.     At that time, Plaintiff was informed by the Hampton police department that the individual he (Plaintiff) was texting, was a twelve-year-old minor by the name of Robert Hartless (hereinafter "Suspect or Hartless"). Prior to this information, Plaintiff was unaware of the demographics of the suspect.

32.     Upon identifying Hartless, Plaintiff immediately ceased all text communications.

33.     On or about March 5, 2015 Plaintiff was invited by officers from the Hampton Police Department to conduct an interview of the minor child. While interviewing Hartless, Plaintiff was permitted to confiscate the suspects phone for evidence.

34.     Plaintiff was able to confirm that Hartless was the individual sending the threatening text messages. Hartless was later charged and convicted.  A short time after, Hartless repeated his

activity of sending threatening messages; he was charged and convicted in the City of Hampton for the same criminal act.

35.     On or about March 6, 2015, Plaintiff proceeded to submit the suspect Hartless' phone to Detective Joe Justice to have the suspects phone analyzed for court. Detective Justice is assigned to the Internet Crimes Against Children Division and was responsible for downloading the information from the suspects phone.

36.     At the time Plaintiff submitted the suspects phone to Det. Justice, Det. Justice apparently read some of the text messages exchanged between Plaintiff and the suspect.

37.     Justice then reported the messages to Sergeant Lewis and Sergeant White, who came and confiscated both the Plaintiff's and the suspect's cellular phones.

38.     At that time, Plaintiff called his Direct Supervisor, Sergeant Bider, who came in from home to ascertain the situation. Upon Sergeant Bider's arrival, he found that White, Lewis, and Capt. Horne were in the Office of Internal Affairs, launching an investigation against Plaintiff.

39.     Upon verbal notification of the investigation in regards to his conduct with suspect Hartless, Plaintiff asked Sgt. Bider when he (Plaintiff) could speak with Captain Horne and Lieutenant Hammond in regards to the investigation against him.

40.     Plaintiff did not receive the Notice of formal charges until May 19, 2016. **(See Exhibit H)**

41.     On or about March 12, 2015, Plaintiff asked Sgt. Bider when would he (Plaintiff) be able to speak to Capt. Horne and Lt. Hammond, in regards to the allegations involving suspect, Hartless

42.     On or about March 16, 2015 Plaintiff was permitted to speak with Lt. Hammond, Capt. Horne, and Sgt. Bider. Plaintiff recounted that facts of his investigation. Plaintiff inquired as

to why he (Plaintiff) was not questioned or asked about the tactics used in his undercover investigation before launching a complaint made by his peer Detective Joe Justice.

43.     During that meeting, Plaintiff was informed that he (Plaintiff) had been questioned about his actions and was given the opportunity to respond. Plaintiff was informed that he signed a Department form acknowledging that he had been questioned; to the contrary the Department was unable to produce such documentation.

44.     On or about April 15, 2015 over a month after Plaintiff was informed that he was under investigation for conduct with suspect Hartless, Bider asked Plaintiff to submit a letter by the end of shift in regards to his actions during the investigation. Prior to this date, Plaintiff was never asked to give detail or information about his actions during the investigation.

45.     In regards to the second set of charges and investigation, on or about April 16, 2015 Plaintiff was called out of a training by Hammond and Bider, who questioned Plaintiff about an entry from April 14, 2015 in Kronos, which is the time keeping system used by the Department. The inquiry suggested that Plaintiff inappropriately reported time and hours. Specifically, it was alleged that Plaintiff had padded his overtime by making a time entry with notes into Kronos which again is the department's time keeping system, but the time entry did not correspond to proof of a physical entry of evidence in the Department's Automated Reporting System (ARS).

46.     Plaintiff was also questioned about his method of collecting evidence. Specifically, Plaintiff was questions as to why he had not placed evidence in a locker upon receipt.

47.     Plaintiff explained that most if not all officers kept his or her evidence in their possession until the officer was finished with the evidence. Although this charge was unsubstantiated, Plaintiff asserts that no other Officer was reprimanded or investigated for the same act.

48.     Plaintiff further asserts that Capt. Horne, Lt. Hammond. And Sgt. Bider discovered, by questioning many of the officers in the unit, that Plaintiff was correct in stating that the majority of officers collected evidence in the same manner as Plaintiff.

49.     On April 29, 2016 Plaintiff filed a letter of Discrimination to Kelvin L. Wright, Chief of Police, indicating that the above reprimands and treatment that he received during the investigation process was different then the treatment his white peers received. *(refer to attachment A)*

50.     Plaintiff alleges that when there is a peer complaint from a white co-worker about another white co-worker, then all parties are called in a meeting to resolve complaint before an investigation is ensued.

51.     Plaintiff asserts that the when Caucasian detective Joe Justice made complaint about Plaintiff's investigation tactics, Internal Affairs was immediately informed and the preliminary report to Internal Affairs began on the same day.

52.     Plaintiff also alleged that the allegations in regards to Kronos are unwarranted and although the allegations received a finding of being unsubstantiated, other Caucasian peers who employed the same method of documenting hours in Kronos were not charged nor investigated.

53.     On or about June 19, 2015 Plaintiff was informed that he would be transferred back to Operations as a result of the charges and because his veracity as an officer was in question. Plaintiff never received a Notice of Charge informing him that his veracity or candor was under investigation.

54.     On or about June 29, 2015 Plaintiff received a letter of reprimand for conduct unbecoming of a police officer about his interaction with Robert Hartless, the suspect who threatened to kill several residents of Chesapeake and law enforcement officers. **(See Exhibit I)**

55. On or about July 6, 2015 Plaintiff received a letter of reprimand for violating Chesapeake Police Department Policy and Procedures and City of Chesapeake Administrative Regulation. **(See Exhibit J)**

56. On or about July 22, 2015 Plaintiff received a letter of reprimand for failure to properly document in the case management system, for changing schedule without prior authorization, and for improperly documenting time in Kronos. **(See Exhibit K)**

57. Upon receiving the letter, Plaintiff attempted to meet with Horne, Hammond, Bider, and Wright to express his concerns, that the command structure was treating him in a manner different from his white co-workers.

58. Prior to the July 22, 2015 letter of reprimand, Plaintiff never received a notice of charges, nor was he afforded the opportunity to meet with Chief Wright to properly rebut such charges.

59. After Plaintiff was transferred back to Operations, he continued to perform his duties in a professional and outstanding manner. He received a great evaluation from his new supervisor. After the evaluation, Plaintiff's new supervisor informed Plaintiff that he (the supervisor) had been questions about Plaintiff's recent evaluation. Plaintiff. Supervisor stated that the old departments' personnel was pissed off about high evaluation.

60. Throughout the investigations, Plaintiff maintained that the actions he was accused of, were some the same actions that his Caucasian co-workers had committed and were not reprimand nor removed from his or her position. **(See Exhibit L** *Plaintiff's rebuttals")*

### COUNT I
### DISCRIMINATION IN VIOLATION OF Title VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000E, ETSEQ.
As to all Defendants
Violation of Title VII's Prohibition Against Employment Discrimination-Race Discrimination -- Disparate Treatment

61.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

62.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq., and 42 U.S.C. Section 1981A, for relief based upon the unlawful employment practices of the above-named Defendant. Specifically, Plaintiff complains of Defendants violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

63.     During his employment with Defendant, Plaintiff was a member of a class protected under Title VII against race based discrimination by his employer, Defendant City of Chesapeake through the Chesapeake Police Department, or by its supervisory personnel.

64.     Plaintiff complained to Horne, Bider, and Hammond about the racial disparity he was being subjected to; however, his concerns were constantly ignored.

### _Specific Racial Discrimination and Disparate Treatment in Investigation Procedures"_

65.     As set forth herein, upon the complaint of Det. Justice against Plaintiff for alleged misconduct. Department personnel including Horne, Hammond, and Bider immediately reported the alleged misconduct to Internal Affairs before Plaintiff had the opportunity to confront the allegations. Plaintiff asserts that when complaints are made against Caucasian similarly-situated individuals within his unit for alleged misconduct, a different protocol or policy is used. Plaintiff specifically notes the following

> a   Detective Adams a white male accused and made a complaint against
> Detective Toothman a white male, to Toothman's supervisors, who are the same
> supervisors in Plaintiff's chain of command and mentioned herein this
> complaint. The supervisors did not immediately inform Internal Affairs, instead

12

they supervisors called an informal meeting amongst the parties in an effort to (1) give both parties a chance to his express his "side"; (2) to allow the for accuses party to address the allegations and (3) to resolve the matter before string a formal investigation. Unlike his Caucasian co-workers, Plaintiff was not afforded this opportunity.

b   Detective. Fischetti made a complaint on Detective. Mayo, both are white. The supervisors did not make an immediate report to Internal Affairs. They talked to both parties and tried to come to a resolution to resolve the complaint.

c   Detective Mayo made a complaint against Detective Fischetti and Detective Adams regarding a hostile work environment. The supervisors did not go to Internal Affairs. They talked to both parties and tried to come to a resolution to resolve the complaint or at best ascertain the positions of both parties.

d   Detective T. Shock, a white male, was assigned to the Criminal Investigations Section. Detective Shock's chain of command discovered he was not properly performing his duties. Specifically, he did not follow up on beyond the initial call to the victim. In some cases, he closed the case without calling the victim at all. In other cases, he would arbitrarily close the case and he had done little to no investigation. Detective Shock was given several opportunities to correct his misconduct. Failing to properly investigate complaints from the residents one took an oath to protect and serve speaks to the veracity of an officer.

66.    Unlike Plaintiff's similarly-situated Caucasian co-workers, Plaintiff, who has an outstanding record and who has not received reprimands throughout his many years with the Police Department,

was never afforded that opportunity to correct any alleged misconduct. Nor was he given a verbal

warning. Instead, Plaintiff was immediately reported to Internal affairs, he was written up, and

removed from the Criminal Investigations Unit.

67.     Plaintiff, as an African-American employee of Defendant was therefore treated in a

disparate manner and was subjected to Defendant Horne, Hammond, Bider and Wrights acts of

subjecting Plaintiff to scrutinized investigation in contrast to white employees who committed

misconduct. unfair policies and practices insofar as that he was treated in an unequal manner and

unlike Caucasian employees similarly situated with the Defendant. Said unfair practices both

harmed Plaintiff's reputation, his ability to attend training classes during the investigation was

suspended, removed him from the prestige and well-earned assignment as a detective in the

Criminal Investigation Unit, and eradicated his clothing allotment benefits.

### *Racial Discrimination and Disparate Treatment in Charging Plaintiff with Conduct Unbecoming of a Police Officer" and removing Plaintiff from the Criminal Investigation Unit*

68.     As set forth herein, during its investigation, Defendant discovered that most if not all the

Officers in Plaintiff's unit had used profanity or other tactics when undercover, "to flush out" a

suspect. However, no other officer was investigated or charged.

69.     As set forth herein; several Caucasian officers have committed egregious acts in violation of

Department policy and procedure and even when investigated, they were not transferred "back on

the street" to Operations. The Caucasian Officers either remained in the Detective Unit or

transferred to a unit with equal prestige and flexibility such as the Warrant Unit. Plaintiff

specifically refers to the following examples

> a.   Detective Thomas Downing, a white male, was convicted of DUI but
> retained his job and kept his assignment in Criminal Investigations with other
> detectives driving him around, because his license was suspended. Plaintiff, who

has an outstanding record was not afforded the opportunity to remain in Criminal Investigations after his investigation.

b.  Detective Michael Toothman, white male, was found to have not investigated cases assigned to him but closed them without doing due diligence. He kept his assignment to Criminal Investigation.

70.  Plaintiff further asserts that Defendant and its employees and agents practice a pattern of

discriminatory conduct against African-American Officers who are investigated and reprimanded.

Plaintiff refers specifically to the following examples:

a.  Officer Andre Dickerson, African American, was assigned to the Warrant Unit and was investigated for an animal he was negligently caring for at his residence. Officer Dickerson was transferred to Operations during or after the investigation.
b.  Officer Elliot Boyd Jr., white male, is also assigned to the warrant unit and negligently shot an African American suspect in Portsmouth, Michael L. Smith. Officer Boyd was not reassigned to Operations; he is still assigned to the Warrant Unit.
c.  Officer Lucius Brooks, African American, who was assigned to the Community Resource Unit(CRU), was reassigned to Operations because of his alleged low productivity, as he was told. In CRU the officers are paired therefore, the arrest made by one of the pair is also accredited to the other. Officer Brooks' partner was white therefore; if Officer Brooks' productivity was low then his white partner's productivity should have been low as well. However, his former partner has not been reassigned to Operations.

d.  Officer Dayna Tucker, an African American, advised she has experienced racial bias. Officer Tucker submitted a school request for school resource officer's training. She was denied the training because she is not a school resource officer. However, two of her white coworkers were granted the training who also is not school resource officers.

71.  Unlike his Caucasian co-workers who received reprimands but were permitted to remain in

the same position and unit, Plaintiff was not. Like the above African- Americans listed above,

Plaintiff, as an African-American employee of Defendant was therefore treated in a disparate manner

and was subjected to Defendant's unfair policies and practices insofar as that he was treated in an

unequal manner and unlike Caucasian employees similarly situated with the Defendant. Said unfair

practices both harmed Plaintiff's reputation, his ability to attend training classes during the

investigation, removed him from the prestige and well-earned assignment and title of detective and eradicated his clothing allotment benefits.

## PLAINTIFF IS SUBJECTED TO SELECTIVELY IMPOSED INTERNAL AFFAIRS INVESTIGATIONS

72.    In April of 2015, Plaintiff was investigated for changing his work schedule to appear in court, without prior authorization for his supervisor, Sgt. Bider.

73.    As set forth herein, Plaintiff asserts that he as well as other officers often changed their schedules without prior authorization from a superior. Plaintiff asserts that such action had become an accepted common practice throughout the entire department.

74.    Plaintiff further asserts that he has first-hand knowledge that Caucasian co-workers have and continue to change schedules without prior approval and have not received a charge or reprimand.

75.    Specifically, the following Caucasian similarly-situated individuals have committed the sane above act without consequence. The individuals listed below stated that they have changed their schedules without prior approval and had never been reprimands or informed not to do so, as the change of schedule to accommodate filed work or court time, without prior approval is an accepted and common practice throughout the Department

      a.   Detective Torres: white male changed his schedule without prior approval and received neither a verbal or written reprimand.

      b.   Detective J. Mills: white male changed his schedule without prior approval and received neither a verbal or written reprimand.

      c.   Detective C. Beveridge: white male changed his schedule without prior approval and received neither a verbal or written reprimand.

d.  Detective C. Bender: white male changed his schedule without prior approval and received neither a verbal or written reprimand.

e.  Detective K. Caish: white male changed his schedule without prior approval and received neither a verbal or written reprimand.

76.     Unlike his Caucasian co-workers who changed their schedule without prior approval and failed to receive a reprimand, Plaintiff received a written reprimand for committing the same act. Plaintiff asserts that although it is an accepted practice for officers to freely change his or her schedule without prior authorization, he chose to notify his supervisor when he did so.  Plaintiff asserts that this was one of the few if not only time he forgot to notify his supervisor of the change. Like the above African- Americans listed above, Plaintiff, as an African-American employee of Defendant was therefore treated in a disparate manner and was subjected to Defendant's unfair policies and practices insofar as that he was treated in an unequal manner and unlike Caucasian employees similarly situated with the Defendant. Said unfair practices both harmed Plaintiff's reputation, his ability to attend training classes during the investigation, removed him from the prestige and well-earned assignment and title of detective and eradicated his clothing allotment benefits.

77.     Plaintiff was also questioned about his method of collecting evidence. Specifically, Plaintiff was questions as to why he had not placed evidence in a locker upon receipt.

78.     Plaintiff explained that most if not all officers kept his or her evidence in their possession until the officer was finished with the evidence. Although this charge was unsubstantiated, Plaintiff asserts that no other Officer was reprimanded or investigated for the same act.

79.     Plaintiff further asserts that Capt. Horne, Lt. Hammond. And Sgt. Bider discovered, by question many of the officers in the unit, that Plaintiff was correct in stating that the majority of officers collected evidence in the same manner as Plaintiff.

80.     The charge relating to Plaintiff's method of collecting evidence was found unsubstantiated. However, upon supervising personnel discovering that other officers were logging evidence in the same manner as Plaintiff, then those officer too should have been investigated or charged. However, as stated, Plaintiff was the *only* officer charged or investigated.

81.     The reason given for investigations against Plaintiff, charges against Plaintiff, and the removal of Plaintiff from the Criminal Investigation Unit was a mere pretext for unlawful discrimination in that Defendant did not discipline or discharge a similarly situated Caucasian employees, who committed the same or similar acts as Plaintiff.

82.     As a further result of Defendants' above stated actions, Plaintiff has been, is being and will be deprived of economic benefits in the form of a monetary clothing allotment, promotion opportunities and job assignments due to him as an employee as such reprimands continue to be part of his employee record and will be reviewed and considered each time Plaintiff seeks a promotion.

83.     The above-named Defendants' conduct was a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.

84.     Furthermore, Defendant intentionally and/or with reckless indifference, engaged in the above stated discriminatory practices against Plaintiff, contrary to Plaintiff's federally protected

rights as guaranteed to him under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981.

85.     The intentional and discriminatory conduct of Defendants (i.e scrutinized investigations, differential treatment in punishment, failing to address complaints of discrimination) and other acts complained of herein was willful, wanton, deliberate, malicious, egregious and outrageous warranting the imposition of punitive/exemplary damages which will serve as an example and deterrent to Defendant and others who would commit similar illegal acts.

86.     As Defendant engaged in discriminatory employment practices with malice or with reckless indifference to Plaintiff's federally protected rights, Plaintiff is entitled to punitive/exemplary damages in addition to compensatory damages and other remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981A.

## COUNT II
## RETALIATION- HOSTILE WORK ENVIORNEMNT
As to all Defendants

87.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

88.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981, for relief based upon the unlawful employment practices of the above-named Defendant. Specifically, Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

89.     Plaintiff, an African-American male and during his employment with Defendant was a member of a class protected under Title VII against race based discrimination by his employer, Defendant or its supervisory personnel.

90.     At all relevant times, Plaintiff willfully, adequately and completely performed all the functions, duties and responsibilities of his employment with Defendant.

91.     On April 13, 2015, Plaintiff orally expressed his concerns of discrimination to upper management about the investigation and charges brought against him. Specifically, to Sgt. Bider

92.     Plaintiff expressed that he was being treated different from other workers in regards to the investigation process.

93.     Plaintiff was also informed that at different times, Horne, Hammond, and Bider were attempting to coerce other workers to report untruthful misconduct about Plaintiff.

94.     On April 29, 2015 Plaintiff reported his same discrimination concerns to upper management in writing to Chief of Police Kevin Wright. Plaintiff had also voiced his concerns to the City's Human resource Department, but those concerns were not addressed until Plaintiff filed an EEO complaint

95.     Plaintiff asserts that after expressing his concerns of discrimination on April 13, 2015, shortly thereafter he stopped receiving cases.

96.     On or about April 16, 2015 Plaintiff was in a bike first aid training, when he was called out in an embarrassing and humiliating fashion to be confronted by Lt. Hammond, Sgt. Bider to question Plaintiff about an overtime entry on April 14,2015.

97.     Plaintiff asserts that the unexpected meeting was out of the norm, as Officers are not usually called out of training unless there is a detrimental need, or an orgulous act has been committed.

98.    Plaintiff asserts that the confrontation was hostile and demeaning. Personnel spoke to Plaintiff in a hostile and disrespectful manner on multiple occasions after Plaintiff complained of discrimination.

99.    Plaintiff asserts that hostile comments were made towards him throughout the investigation, making it such that Plaintiff became apprehensive in approaching personnel to include Hammond, Bider, Horne, and Wright,

100.    Plaintiff was nor permitted to teach or instruct courses in which he had touhht in the past.

101.    Plaintiff was prohibited from participating in youth events in which he had participated in over the last seven years.

102.    Plaintiff asserts that he experienced a high degree of stress during the time period mentioned in this complaint. Such stress and hostility caused Plaintiff to suffer from high blood pressure, panic attacks, and heart problems.

103.    One June 16, 2015 over ten entries of alleged misconduct were made against Plaintiff via the Department's tracking system known as Human Patterns. Human Patterns is a system used by the Department to enter and track officers' conduct. (**See Attachment M**)

104.    On June 16, 2015, the multiple entries were made by the same individual Sgt. Bider. The entries indicated alleged misconduct of the Plaintiff from the period of March 1, 2015 to June 1, 2015.

105.    Prior to reporting his concerns of discrimination, Plaintiff does not recall having multiple if any entries of misconduct entered into Human Patterns

106.    On June 19, 2015 Plaintiff was informed that he was being transferred out of the Detective unit and back to Operations as a result of the charges against him and for his lack of veracity

107.    On June 29, 2015 Plaintiff received another letter of reprimand.

108.    On July 6, 2015 Plaintiff received another letter of reprimand.

109.    On July 22, 2015 Plaintiff received yet another letter of reprimand, for which he never received a notice of charges.

110.    The law is clear that under Title VII it is an unlawful employment practice for an employer to discriminate against any of his employees because (the employee) has opposed any practice that is unlawful or exercising a protected right. An unlawful employment action includes terminating, reprimanding, or demoting an employee as retaliation for opposing such practices or complaining of such. See." 42 U.S.C. § 2000e-3(a).

111.    To sustain a retaliation claim a plaintiff must establish a prima facie by showing (1) that he engaged in a protective activity (such as filing a discrimination complaint or opposing discriminatory activity); (2) that his employer took adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse action *Matvia v. Bald Head Island Mgmt., Inc.,* 259 F.3d 261, 271 (4th Cir.2001). Further, once a Plaintiff has made a prima facie case, the burden then shifts to Defendant to proffer evidence of a legitimate, non-retaliatory reason for the discharge.


112.    In *Hill* v. *Lockhead Martin Logistics Mgmt, Inc.,* 314 F.3d 657, 677 (4th Cir.2003), where Plaintiff brought a claim against her employer for sex and age discrimination, as well as a claim for reprimand and untimely firing in retaliation for her complaints of discrimination, the court held that Hill established a prima facie case of retaliation when (1)she showed that she engaged in a protective activity when she made several complaints to personnel about discriminatory practices and treatment (2) when she was terminated shortly after engaging in such activity. *Hill,* 314 F.3d

678. In addition, the court held that a causal connection may be inferred when an employee is discharged after complaining of discriminatory practices.

113. Applying *Hill* to the present case, Plaintiff has established a prima facie case of retaliation. (1). he engaged in protected activity when he complained to personnel concerning personal discrimination. (2). His employer took adverse action against him and (3) a causal connection exist between the protected activity and adverse action (Plaintiff's removal from the Detective Until, the multiple reprimands, and the multiple entries against after making discrimination complaints and refusing is highly suggestive of a retaliatory motive), thus establishing a causal connection. *See Id.*

114. As a further result of the Defendants collective above stated actions, Plaintiff has been, is being and will be deprived of economic benefits in the form of a monetary clothing allotment, promotion opportunities and job assignments due to him as an employee as such reprimands continue to be part of his employee record and will be reviewed and considered each time Plaintiff seeks a promotion.

115. The above-named Defendants' conduct was a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.

## DAMAGES

116. 42 U.S.C. § 2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... race ...; or (2) to limit, segregate, or classify his employees. .in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... race".

117.    Plaintiff is a member of a protected group, that is, African-American.

118.    The defendant, by and through its employees named herein violated Plaintiff's rights under Title VII (42 U.S.C. §2000e, et seq.) by engaging in actions and/or activities constituting racial discrimination, retaliation, and hostile work environment as alleged above.

119.    As a direct and proximate result of the unlawful conduct of defendant, Plaintiff has suffered, and will in the future suffer, great damages including loss of economic benefits, loss of career opportunities, promotions and advancements; loss of fringe benefits; embarrassment, humiliation, and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other nonpecuniary injury in amounts to be determined at trial.

120.    In addition, Plaintiff has incurred and continues to accrue attorneys' fees and other legal cost

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.      Injunctive relief on the 42 U.S.C. § 2000 claim, enjoining the defendant from continuing racially discriminatory policies;

B.      Compensatory and punitive damages in a yet undetermined amount on the 42 U.S.C. § 1981 Title VII claim; for past and future economic and non-economic losses, including extreme emotional distress and mental anguish, impairment of the quality of life; and consequential loses;

C.      Reasonable expenses and attorney's fees incurred in bringing this action; and,

D.      Such other relief as the Court deems just and proper.

Plaintiff demands trial by jury.


Respectfully submitted,
Wade B. Satterfield

By: _____/s/_____

                Carteia V. Basnight, Esquire
                Law Office of Carteia V. Basnight
                Virginia Bar No. 79856
                Counsel for Plaintiff Wade B. Satterfield
                1919 Commerce Drive Suite 110
                Hampton, Virginia 23666
                (757) 838-0001 (tel.)
                (757) 548-5871 (fax)
                Carteia.basnight@gmail.com